**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

**R. ALEXANDER ACOSTA**, Secretary :
of Labor, United States Department of Labor, :
: 
                    Plaintiff, :     CIVIL ACTION
: 
     v. :     Case No.   17-cv-4285
: 
**ROBERT J. FIASCONE, PATRICK ADAMS** :
**TONINA COZZO, VIVIENNE BAILEY** :
**and the NATIONAL ALLIED WORKERS** :
**UNION LOCAL 831 INSURANCE** :
**TRUST FUND,** :
: 
                Defendants. :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

## COMPLAINT

    Plaintiff R. Alexander Acosta, Secretary of Labor, United States Department of Labor

("Secretary"), alleges as follows:

    1.    This action arises under Title I of the Employee Retirement Income Security Act

of 1974 ("ERISA"), as amended, 29 U.S.C. § 1001, et seq., and is brought by the Secretary under

ERISA § 502(a)(2) and (5), 29 U.S.C. § 1132(a)(2) and (5), to enjoin acts and practices that

violate the provisions of Title I of ERISA, to obtain appropriate equitable relief for breaches of

fiduciary duty under ERISA § 409, 29 U.S.C. § 1109, and to obtain such further equitable relief

as may be appropriate to redress and to enforce the provisions of Title I of ERISA.

    2.    This Court has jurisdiction over this action pursuant to ERISA § 502(e)(1), 29

U.S.C. § 1132(e)(1).

    3.    The National Allied Workers Union Local 831 Insurance Trust Fund ("Fund")

provides, among other things, medical and other health and welfare benefits, including dental,

vision, and prescription drug benefits, to employees and eligible employee dependents of participating employers.

4.     Venue lies in the Northern District of Illinois, Eastern Division, pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Fund is administered in Westchester, Cook County, Illinois, within this district.

## GENERAL ALLEGATIONS

### A. Employer Associations, Participating Employers, and the Fund

5.     The National Allied Workers Union Local 831 ("Local 831") holds itself out as a union located in Westchester, Illinois, and sponsors the Fund.

6.     The Fund was established effective April 1, 2001, pursuant to an Insurance Trust Agreement between Local 831, various employers, and individual Trustees.

7.     The Fund was amended and restated effective January 1, 2007, pursuant to an Insurance Trust Agreement between Local 831, various employers, and individual Trustees ("Trust Agreement").

8.     The Fund is named as a defendant herein pursuant to Federal Rule of Civil Procedure 19(a) solely to assure that complete relief can be granted.

9.     Between April 2001 and April 2012, Local 831 entered into three separate collective bargaining agreements ("CBAs") with three New York-based employer associations–Employers Network Association (also known as ENA Administrators, Inc.) ("ENA"), International Coach Federation ("ICF"), and Benefits Marketing Innovators, Inc. ("BMI") (collectively, "Employer Associations").

10.    An employer was required to be a member of one of the three Employer Associations in order to become eligible to participate in the Fund ("Participating Employer").

11. ENA sought out and enrolled Participating Employers to join the Fund. Upon information and belief, ICF and BMI also sought out and enrolled Participating Employers to join the Fund.

12. The CBAs referenced in paragraph 9 above contain general provisions regarding benefits, among other things, and state that health, death, or other benefits specified in an Employer's Addendum would be provided through the Fund and that Participating Employers would make contributions for such benefits.

13. By joining one of the Employer Associations and becoming a party to one of the CBAs referenced in paragraph 9 above and executing an Employer's Addendum, each Participating Employer agreed to be bound by the Trust Agreement.

14. The Trust Agreement states, "The Trust Fund shall be comprised of Employer contributions, if any, made pursuant to Collective Bargaining Agreements together with any and all assets derived from Employer contributions, including insurance . . . Participant contributions, if any, together with any and all assets derived from Participant contributions, other investments made and held by the Trustees, all monies received by the Trustees as contributions or as income from investments made and held by the Trustees or otherwise, and any other property received and held by the Trustees for the uses and purposes set forth in this Agreement, where any of the foregoing is derived from the Employer and/or Participant contributions. The Trustees shall hold such assets in trust and deal with them in accordance with this Agreement." Trust Agreement, § 1.2.

15. By joining one of the Employer Associations and becoming a party to one of the CBAs referenced in paragraph 9 above and executing an Employer's Addendum, each Participating Employer agreed that the medical and other health and welfare benefits would be

3

provided through the Fund and that each Participating Employer would make contributions to the Fund in order to pay for the benefits.

16.     The Participating Employers obtained medical and other health and welfare benefits, including dental, vision, and prescription drug benefits, for their employees through the Fund.

17.     Under the terms of the CBAs referenced in paragraph 9 above, Fund participants submitted claims for benefits to the Fund and received payments on allowed claims.

18.     Participating Employers sent their monthly premiums, which consisted of employer and employee contributions (depending on the employer) to the Employer Associations.  The Employer Associations sent the employer and employee contributions to the Fund, which held them in trust pending the payment of benefits and administrative expenses.

19.     Through the facts described in paragraphs 10 through 18 above, each Participating Employer established or maintained an employee welfare benefit plan as defined in ERISA section 3(1), 29 U.S.C. § 1002(1), which was also an employee benefit plan as defined in ERISA section 3(3), 29 U.S.C. § 1002(3).  Each individual employee welfare benefit plan is covered by ERISA pursuant to ERISA section 4(a), 29 U.S.C. § 1003(a).  Henceforth, this complaint will refer to all of these individual employee welfare benefit plans collectively as the "Plans."

20.     The Fund is a "multiple employer welfare arrangement" ("MEWA") within the meaning of section 3(40) of ERISA, 29 U.S.C. § 1002(40), holding and administering the assets of one or more employee welfare benefit plans within the meaning of section 3(1) of ERISA.

21.     The assets held by the Fund consist solely of plan assets, including contributions by participating employers and their employees, which the Plans utilize to provide benefits.  This

complaint refers to the "Fund" as the Fund itself and collectively as to all the Plans described in paragraph 19 above.

22.     The Fund is self-funded and is marketed to employers or sole proprietors.

23.     Because each Plan is covered by ERISA pursuant to ERISA section 4(a), 29 U.S.C. § 1003(a), the Fund's assets are also subject to coverage of ERISA pursuant to section 4(a) of ERISA, 29 U.S.C. § 1003(a).

24.     As of March 31, 2016, the Fund had 90 Participating Employer Plans, 2,239 participants, and net assets of negative $663,189.

### B. Fund Governance and the Trustees

25.     The Trust Agreement provides that "[t]he Trust shall be administered by four Trustees, two of whom shall be appointed by the Union and shall act as Employee Trustees, and two of whom shall be elected by the Employers and shall act as Employer Trustees . . . ." Trust Agreement Article 3.1.

26.     The Trust Agreement provides that Local 831 shall select Employee Trustees in the event of an Employee Trustee vacancy. *Id.* at Article 3.3.

27.     The Trust Agreement provides that in the case of one Employer Trustee vacancy, the remaining Employer Trustee is required to nominate a successor Employer Trustee. In the case of two simultaneous Employer Trustee vacancies, the Participating Employers are required to nominate two successor Employer Trustees. *Id.* at Article 3.3.

28.     The Trust Agreement provides that the Trustees "have authority to control and manage operation and administration of the Trust in accordance with applicable law." *Id.* at Article 5.1.

29.     From at least December 8, 2009, to the present, Robert Fiascone was a Trustee of the Fund ("Trustee Fiascone").

30.     From at least January 1, 2010, to the present, Patrick Adams was a Trustee of the Fund ("Trustee Adams").

31.     From at least January 1, 2014, to the present, Tonina Cozzo (formerly known as Tonina Fox and Tonina Chiarelli) was a Trustee of the Fund ("Trustee Cozzo").

32.     From at least August 25, 2015, to the present, Vivienne Bailey was a Trustee of the Fund ("Trustee Bailey").

33.     While serving as a Trustee between at least December 8, 2009, and March 31, 2016, Trustee Fiascone had discretionary authority or discretionary responsibility in the administration of the Fund and each of the Plans.

34.     While serving as a Trustee between at least January 1, 2010, and March 31, 2016, Trustee Adams had discretionary authority or discretionary responsibility in the administration of the Fund and each of the Plans.

35.     While serving as a Trustee between at least January 1, 2014, and March 31, 2016, Trustee Cozzo had discretionary authority or discretionary responsibility in the administration of the Fund and each of the Plans.

36.     While serving as a Trustee between at least August 25, 2015, and March 31, 2016, Trustee Bailey had discretionary authority or discretionary responsibility in the administration of the Fund and each of the Plans.

37.     While serving as a Trustee between at least December 8, 2009, and March 31, 2016, Trustee Fiascone exercised discretionary authority or discretionary control respecting

management of the Fund and exercised authority or control respecting disposition of the Fund's assets.

38.     While serving as a Trustee between at least January 1, 2010, and March 31, 2016, Trustee Adams exercised discretionary authority or discretionary control respecting management of the Fund and exercised authority or control respecting disposition of the Fund's assets.

39.     While serving as a Trustee between at least January 1, 2014, and March 31, 2016, Trustee Cozzo exercised discretionary authority or discretionary control respecting management of the Fund and exercised authority or control respecting disposition of the Fund's assets.

40.     While serving as a Trustee between at least August 25, 2015, and March 31, 2016, Trustee Bailey exercised discretionary authority or discretionary control respecting management of the Fund and exercised authority or control respecting disposition of the Fund's assets.

41.     Therefore, Trustees Fiascone, Adams, Cozzo, and Bailey were fiduciaries over the plan assets contained in the Fund and the Plans within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), during the time periods alleged in paragraphs 33 through 40 above.

### C. Service Providers

42.     From at least 2002 through March 31, 2016, Aegis Administrative Services, Inc. ("Aegis Administrative Services") was an Illinois corporation solely owned by Geri Ann Cangelosi ("Cangelosi").

43.     From at least December 8, 2009, through March 31, 2016, Aegis Administrative Services served as the Fund's third-party administrator and its claims administrator for out-of-network claims, and as such is a party in interest to the Fund as defined in ERISA section 3(14)(B), 29 U.S.C. § 1002(14)(B).

44.     From at least December 8, 2009, through March 31, 2016, Aegis Administrative Services processed out-of-network claims and paid for allowed out-of-network claims from a designated Fund checking account.  Aegis Administrative Services did not adjudicate in-network claims.

45.     From at least 2004 through March 31, 2016, Noble Consulting Group was an Illinois sole proprietorship solely owned by Cangelosi.  Noble Consulting Group provided services to the Fund throughout this period and, therefore, is a party in interest to the Fund as defined in ERISA section 3(14)(B), 29 U.S.C. § 1002(14)(B).

46.     Since at least January 1, 2004, Cangelosi was the owner and an employee of Aegis Administrative Services and Noble Consulting Group.  Therefore, Cangelosi is a party in interest to the Fund as defined in ERISA section 3(14)(H), 29 U.S.C. § 1002(14)(H).

## COUNT ONE
### The Fund Paid Aegis Unreasonable Compensation In Relation To the Fund's Discount Benefit Program

47.     Paragraphs 1 through 46 above are realleged and incorporated in these allegations.

48.     Article 5.2b of the Trust Agreement allows the Trustees to employ agents and counsel to manage and administer the assets in the Fund and to pay them reasonable compensation.

49.     Aegis Administrative Services has been the Fund's third party administrator and claims processor since the Fund began operations.

50.     Upon information and belief, from December 8, 2009, through March 31, 2016, Aegis Administrative Services provided services to the Fund pursuant to a series of Claims Administrator Services Agreements entered into between Aegis Administrative Services and the Fund ("Claims Administrator Services Agreements").

51.     For example, Aegis Administrative Services provided services to the Fund under a Claims Administrator Services Agreement that the parties executed on September 26, 2013, and was in effect from at least January 1, 2012, through December 31, 2014 (the "2012 Claims Administrator Services Agreement").

52.     As Fund Trustees, Trustee Fiascone and Adams caused the Fund to enter into the 2012 Claims Administrator Services Agreement on September 26, 2013.

53.     Cangelosi, as the president of Aegis Administrative Services, caused Aegis Administrative Services to enter into the Claims Administrator Services Agreement on September 26, 2013.

54.     From January 1, 2012, through December 31, 2014, the 2012 Claims Administrator Services Agreements allowed Aegis Administrative Services to provide a "Discount Benefits Program," which included, among other things, prescription drug, vision, dental, and chiropractic discount benefits to Fund participants.

55.     Upon information and belief, from December 8, 2009, through December 31, 2011, and from January 1, 2015, through March 31, 2015, the Claims Administrator Services Agreements in effect during these time periods allowed Aegis Administrative Services to provide a "Discount Benefits Program," which included, among other things, prescription drug, vision, dental, and chiropractic discount benefits to Fund participants.

56.     From January 1, 2012, through December 31, 2014, the 2012 Claims Administrator Services Agreement allowed Aegis Administrative Services to charge the Fund a fee of $15 per participant per month to administer the Discount Benefits Program.

57.     Upon information and belief, from December 8, 2009, through December 31, 2011, and from January 1, 2015, through March 31, 2015, the Claims Administrator Services

Agreements in effect allowed Aegis Administrative Services to charge the Fund a fee of $15 per participant per month to administer the Discount Benefits Program.

58. From January 1, 2012, through December 31, 2014, the Discount Benefits Program fee charged by Aegis Administrative Services included administration costs that Aegis Administrative Services incurred for the Discount Benefit Program's implementation, printing of cards, welcome kits, postage, and customer service.

59. Upon information and belief, from December 8, 2009, through December 31, 2011, and from January 1, 2015, through March 31, 2015, the Discount Benefits Program fee charged by Aegis Administrative Services included administration costs that Aegis Administrative Services incurred for the Discount Benefit Program's implementation, printing of cards, welcome kits, postage, and customer service.

60. From December 8, 2009, through March 31, 2015, Trustees Fiascone and Adams approved the payment of a total of $1,472,106 in fees to Aegis Administrative Services for the provision of the Discount Benefits Program.

61. From January 1, 2014, through March 31, 2015, Trustee Cozzo approved the payment of a total of $509,490 in fees to Aegis Administrative Services for the provision of the Discount Benefits Program.

62. From December 8, 2009, through March 31, 2015, Aegis Administrative Services charged the Fund between $15 to $18 per participant per month to provide the Discount Benefits Program. During this period, the approximate cost to Aegis Administrative Services to provide the Discount Benefits Program was between $3 to $4 per participant per month.

63. From December 8, 2009, through March 31, 2015, Aegis Administrative Services' costs consisted of a $1.50 per participant per month payment to Envision

Pharmaceutical for prescription drug discounts and $1.07 to $1.50 per participant per month payment to Augeo for dental and vision in-network access.

64.     From December 8, 2009, through March 31, 2015, Aegis Administrative Services also paid a flat monthly fee of $175 to National Health Service (aka "My Healthy Lifestyle") for Plan participants to have online access to manage benefits and wellness programs.

65.     From December 8, 2009, through March 31, 2015, Aegis Administrative Services paid a total cost of $215,632 to third parties to provide benefits under the Discount Benefits Program, but charged and collected from the Fund a total of $1,382,916, a markup of over 400%.

66.     From December 8, 2009, through at least March 31, 2015, Trustees Fiascone and Adams retained the services of Aegis Administrative Services to provide a Discount Benefits Program to the Fund without:

> a.     Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts for the Discount Benefit Program were reasonable;

> b.     Engaging in any investigation to determine whether there were other providers who could provide the Discount Benefit Program at a lower cost;

> c.     Issuing a request for proposal ("RFP") or engaging in any bid process for the Discount Benefit Program;

> d.     Requesting information from other vendors regarding these services; or

> e.     Requesting additional information from Cangelosi or Aegis Administrative Services regarding the actual cost of providing this program.

67.     From January 1, 2014, through at least March 31, 2015, Trustee Cozzo retained the services of Aegis Administrative Services to provide a Discount Benefits Program to the Fund without:

    a.      Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts for the Discount Benefit Program were reasonable;

    b.      Engaging in any investigation to determine whether there were other providers who could provide the Discount Benefit Program at a lower cost;

    c.      Issuing a RFP or engaging in any bid process for the Discount Benefit Program;

    d.      Requesting information from other vendors regarding these services; or

    e.      Requesting additional information from Cangelosi or Aegis Administrative Services regarding the actual cost of providing this program.

68.    By the allegations described in paragraphs 47 through 60 and 62 through 66 above from December 8, 2009, through at least March 31, 2015, Trustees Fiascone and Adams:

    a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

    b.      failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

    c.      failed to discharge their duties "in accordance with the documents and instruments" of the National Allied Workers Union Local 831 Trust Fund to the extent that they are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

     d.     used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

     e.     used the Fund's assets in transactions which they knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

69.     By the allegations described in paragraphs 47 through 59, 61 through 65, and 67 above from January 1, 2014, through at least March 31, 2015, Trustee Cozzo:

     a.     failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

     b.     failed to discharge her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

     c.     failed to discharge her duties "in accordance with the documents and instruments" of the Fund to the extent that they are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D);

     d.     used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

13

e.  used the Fund's assets in transactions which she knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

70.  As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, and Cozzo as set forth in paragraphs 68 through 69 above, the Fund has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

<u>COUNT TWO</u>
**The Fund's Payment of Insurance Commissions to Aegis Administrative Services**

71.  Paragraphs 1 through 46 and 50 through 53 above are realleged and incorporated in these allegations.

72.  Since at least 2003, the Fund through Aegis Administrative Services contracted with AIG/Medical Excess to obtain excess stop-loss insurance.

73.  AIG/Medical Excess provided excess stop-loss insurance on an annual basis to the Fund.

74.  AIG/Medical Excess charged the Fund a set rate per Fund participant per month for stop-loss insurance coverage.  The rate AIG/Medical Excess charged the Fund included a built-in 10% commission that was owed to the broker of record on the policy.

75.  Each month from December 8, 2009, through March 31, 2016, Aegis Administrative Services paid the stop-loss insurance premiums in the following manner:

a.  Aegis Administrative Services completed a "Stop Loss Premium Statement" that contained the gross monthly premium due AIG/Medical Excess, which was equal to the current month's number of Fund participants multiplied by the specific AIG/Medical Excess rate per person;

      b.      Aegis Administrative Services deducted a 10% commission from this gross monthly premium, which it placed on the "Stop Loss Premium Statement" and then sent the "Stop Loss Premium Statement" to AIG/Medical Excess, to determine the net monthly premium owed to AIG/Medical Excess;

      c.      Aegis Administrative Services sent an amount equal to the net monthly premium (the gross premium minus the 10% commission) to AIG/Medical Excess;

      d.      Aegis Administrative Services then billed the Fund for 100% of the monthly gross premium as stated on the Stop-Loss Premium Statement;

      e.      The Fund paid an amount equal to 100% of the monthly gross premium using the Fund's assets to Aegis Administrative Services; and

      f.      Each month, Aegis Administrative Services retained 10% of the monthly gross premium paid to it by the Fund as the brokerage commission on the Fund's contract with AIG/Medical Excess.

76.     The 2012 Claims Administrator Services Agreement prohibited Aegis Administrative Services from accepting "any direct or indirect compensation from a third party as a result of its relationship with the Fund" and required Aegis Administrative Services to "[o]nly use Plan assets for the purpose of paying claims."  2012 Claims Administrator Services Agreement, §§ III.(9) and  IV.D.

77.     Upon information and belief, the Claims Administrator Services Agreements in effect from December 8, 2009, through December 31, 2011, prohibited Aegis Administrative Services from accepting "any direct or indirect compensation from a third party as a result of its relationship with the Fund" and required Aegis Administrative Services to "only"[o]nly use Plan assets for the purpose of paying claims."

78.     From December 8, 2009, through at least October 13, 2015, Trustees Fiascone and Adams retained the services of Aegis Administrative Services for services related to procuring stop-loss coverage on behalf of the Fund without:

        a.      Requesting or requiring Aegis Administrative Services to make any disclosures relating to its stop-loss commissions;

        b.      Engaging in any investigation to determine whether Aegis Administrative Services' stop-loss commissions were reasonable;

        c.      Engaging in any investigation to determine whether the Fund's stop-loss insurance could be obtained at a lower cost; or

        d.      Issuing a RFP or engaging in any bid process for the services provided by AIG/Medical Excess.

79.     From January 1, 2014, through at least October 13, 2015, Trustee Cozzo retained the services of Aegis Administrative Services for services related to procuring stop-loss coverage on behalf of the Fund without:

        a.      Requesting or requiring Aegis Administrative Services to make any disclosures relating to its stop-loss commissions;

        b.      Engaging in any investigation to determine whether Aegis Administrative Services' stop-loss commissions were reasonable;

        c.      Engaging in any investigation to determine whether the Fund's stop-loss insurance could be obtained at a lower cost; or

        d.      Issuing a RFP or engaging in any bid process for the services provided by AIG/Medical Excess.

80.     From August 25, 2015, through at least October 13, 2015, Trustee Bailey retained the services of Aegis Administrative Services for services related to procuring stop-loss coverage on behalf of the Fund without:

a.     Requesting or requiring Aegis Administrative Services to make any disclosures relating to its stop-loss commissions;

b.     Engaging in any investigation to determine whether Aegis Administrative Services' stop-loss commissions were reasonable;

c.     Engaging in any investigation to determine whether the Fund's stop-loss insurance could be obtained at a lower cost; or

d.     Issuing a RFP or engaging in any bid process for the services provided by AIG/Medical Excess.

81.     Upon information and belief, from October 14, 2015, through March 31, 2016, Trustees Fiascone, Adams, Cozzo, and Bailey retained the services of Aegis Administrative Services for services related to procuring stop-loss coverage on behalf of the Fund without:

a.     Requesting or requiring Aegis Administrative Services to make any disclosures relating to its stop-loss commissions;

b.     Engaging in any investigation to determine whether Aegis Administrative Services' stop-loss commissions were reasonable;

c.     Engaging in any investigation to determine whether the Fund's stop-loss insurance could be obtained at a lower cost; or

d.     Issuing a RFP or engaging in any bid process for the services provided by AIG/Medical Excess.

82. From December 8, 2009, through at least March 31, 2016, Trustees Fiascone and Adams approved and paid Aegis Administrative Services' monthly charges, which included the monthly gross stop-loss insurance premiums.

83. From January 1, 2014, through at least March 31, 2016, Trustee Cozzo approved and paid Aegis Administrative Services' monthly charges, which included the monthly gross stop-loss insurance premiums.

84. From August 25, 2015, through at least March 31, 2016, Trustee Bailey approved and paid Aegis Administrative Services' monthly charges, which included the monthly gross stop-loss insurance premiums.

85. From December 8, 2009, through March 31, 2016, the Fund paid $951,406.28 in commissions to Aegis Administrative Services.

86. On January 8, 2015, Trustees Fiascone and Adams approved an amendment to the 2012 Claims Administration Agreement in order to retroactively allow (effective September 26, 2013) Aegis Administrative Services to accept insurance commissions in connection with the purchase of stop-loss insurance on behalf of the Fund.

87. The amendment referenced in paragraph 88 above was retroactive at Cangelosi's request.

88. Rather than seeking disgorgement of Aegis Administrative Services' contractually prohibited commissions, Trustees Fiascone and Adams retroactively authorized them.

89. Trustees Fiascone and Adams approved the amendment referenced in paragraph 88 above without negotiation on behalf of the Fund.

90. By the allegations described in paragraphs 71 through 78, 81 through 82, and 85 above, from December 8, 2009, through March 31, 2016, Trustees Fiascone and Adams:

      a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

      b.      used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

      c.      used the Fund's assets to engage in transactions which Trustees Fiascone and Adams knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

91.      By the allegations described in paragraphs 71 and 86 through 89 above, Trustees Fiascone and Adams:

      a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

      b.      failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

92.      By the allegations described in paragraphs 71 through 77, 79, 81, 83, and 85 above, from January 1, 2014, through at least March 31, 2016, Trustee Cozzo:

a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.      used the Fund's assets to engage in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

c.      used the Fund's assets to engage in transactions which Trustee Cozzo knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

93.     By the allegations described in paragraphs 71 through 77, 80 through 81, and 84 through 85 above, from August 25, 2015, through March 31, 2016, Trustee Bailey:

a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.      used the Fund's assets to engage in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

c.      used the Fund's assets to engage in transactions which  Trustee Bailey knew or should have known constituted a direct or indirect transfer to, or use by or for the

benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

94.     As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, Cozzo, and Bailey as set forth in paragraphs 90 through 93 above, the Fund has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

**<u>COUNT THREE</u>**
**The Fund's Payment of Unreasonable**
**Administrative Fees to Aegis Administrative Services Resulting from Overpayments**

95.     Paragraphs 1 through 46 and 50 through 53 above are realleged and incorporated in these allegations.

96.     The 2012 Claims Administrator Services Agreement contained the following administration and service fee schedule on a per participant, per month basis:

     a.     "$38.00 to administer the Medical Plan for Single Enrollments";

     b.     "$47.00 to administer the Medical Plan for Family Enrollments"; and

     c.     The 2012 Claims Administrator Services Agreement did not contain a Preferred Provider Organization ("PPO") fee.

97.     Upon information and belief, the Claims Administrator Services Agreements in effect from December 8, 2009, through December 31, 2011, contained the same fee structure described in paragraph 96 above.

98.     From December 8, 2009, through December 31, 2014, Trustees Fiascone and Adams approved the payment of the following administration and service fees to Aegis Administrative Services, which were identified on monthly invoices from Aegis Administrative Services to the Fund:

      a.      $38.00 to administer the Fund for Single Enrollments;

      b.      $45.00 to administer the Fund for Family Enrollments; and

      c.      $3.25 in "additional PPO fees per contract".

99.     From January 1, 2014, through December 31, 2014, Trustee Cozzo approved the payment of the following administration and service fees to Aegis Administrative Services, which were identified on monthly invoices from Aegis Administrative Services to the Fund:

      a.      $38.00 to administer the Fund for Single Enrollments;

      b.      $45.00 to administer the Fund for Family Enrollments; and

      c.      $3.25 in "additional PPO fees per contract".

100.    From December 8, 2009, through at least December 31, 2014, Trustees Fiascone and Adams paid the monthly invoices of Aegis Administrative Services without:

      a.      Taking prompt corrective action when Legacy Professionals, LLP, the CPA firm that audited the Fund's financials in 2012, 2013, and 2014, informed the Trustees in writing on December 28, 2012, that the Fund was paying fees Aegis Administrative Services that were not in accordance with the contractual rates and fees that were not listed in the contract;

      b.      Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts matched the contractual requirements; or

      c.      Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about auditing Aegis Administrative Services' fees to ensure that they were in accordance with the contractual rates.

101.    From January 1, 2014, through at least December 31, 2014, Trustee Cozzo paid the monthly invoices of Aegis Administrative Services without:

a. Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts matched the contractual requirements; or

b. Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about auditing Aegis Administrative Services' fees to ensure that they were in accordance with the contractual rates.

102. From December 8, 2009, through at least December 31, 2014, as a result of the Trustees' approval of the payments identified in paragraphs 98 and 99 above, which were in excess of the Claims Administrator Services Agreements set forth in paragraphs 96 and 97 above, the Fund paid $211,962 more than was required under the terms of the contract with Aegis Administrative Services.

103. By the allegations set forth in paragraphs 95 through 98, 100, and 102 above, from at least December 8, 2009, through December 31, 2014, Trustees Fiascone and Adams:

a. failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b. failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c. used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

23

      d.      used the Fund's assets in transactions which Trustees Fiascone and Adams knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

104.    By the allegations set forth in paragraphs 95 through 97, 99, and 101 through 102 above from January 1, 2014, through December 31, 2014, Trustee Cozzo:

      a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

      b.      failed to discharge her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

      c.      used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

      d.      used the Fund's assets in transactions which Trustee Cozzo knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

105.    As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, and Cozzo as set forth in paragraphs 103 through 104 above, the Fund has suffered

injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

## COUNT FOUR
**The Fund's Payment of Unreasonable Administrative Fees to Noble Consulting Group**

106.    Paragraphs 1 through 46 above are realleged and incorporated in these allegations.

107.    Upon information and belief, from December 8, 2009, through March 31, 2015, Noble Consulting Group operated pursuant to a series of Consultant Agreements between Noble Consulting Group and the Fund ("Consultant Agreements").

108.    For example, Noble Consulting Group provided services to the Fund under a Consultant Agreement between Noble Consulting Group and the Fund executed by Noble Consulting Group on September 26, 2013, which was in effect from at least January 1, 2012, through December 31, 2014 (the "2012 Consultant Agreement").

109.    In their capacity as Trustees, Trustee Fiascone and Adams caused the Fund to enter into the 2012 Consultant Agreement on September 26, 2013, and September 27, 2013, respectively.

110.    Cangelosi, as the owner of Noble Consulting Group, caused Noble Consulting Group to enter into the 2012 Claims Administrator Services Agreement on September 26, 2013.

111.    The 2012 Consultant Agreement required Noble Consulting Group to provide twenty-eight services to the Fund, including one identical service that Aegis Administrative Services was required to perform pursuant to the 2012 Claims Administrator Services Agreement: "Assist in the coordination of services of other professionals, including working with the Plan's legal counsel and accounting firm to ensure compliance with all applicable laws." 2012 Claims Administrator Services Agreement, § III(8); 2012 Consultant Agreement, § III(17).

112.     Upon information and belief, from December 8, 2009, through December 31, 2011, and from January 1, 2015, through March 31, 2015, the Consultant Agreements between Noble Consulting Group and the Fund required Noble Consulting Group to provide twenty-eight services to the Fund, including one identical service that Aegis Administrative Services was required to perform pursuant to the Claims Administrator Services Agreements: "Assist in the coordination of services of other professionals, including working with the Plan's legal counsel and accounting firm to ensure compliance with all applicable laws."

113.     The 2012 Consultant Agreement also required Noble Consulting Group to "[m]onitor and administer the services provided by the Claims Administrator [Aegis Administrative Services] to ensure that all duties under the Claims Administrative Services Agreement . . . are met in a manner consistent with the Consultant's obligations under this Agreement . . . ." 2012 Consultant Agreement, § III(28).

114.     Upon information and belief, from December 8, 2009, through December 31, 2011, and from January 1, 2015, through March 31, 2015, the Consultant Agreements between Noble Consulting Group and the Fund also required Noble Consulting Group to "[m]onitor and administer the services provided by the Claims Administrator [Aegis Administrative Services] to ensure that all duties under the Claims Administrative Services Agreement . . . are met in a manner consistent with the Consultant's obligations under this Agreement . . . ."

115.     In effect, the Consultant Agreements sections described in paragraphs 113 and 114 above required Cangelosi, as Noble Consulting Group, to monitor herself as Aegis Administrative Services.

116.     From December 8, 2009, through March 31, 2015, Trustees Fiascone and Adams retained the services of Noble Consulting Group without:

26

a.      Engaging in any investigation to determine whether Noble Consulting Group's fee amounts were reasonable;

b.      Engaging in any investigation to determine whether there were other providers who could provide the services provided by Noble Consulting Group at a lower cost;

c.      Issuing a RFP or engaging in any bid process for the services provided by Noble Consulting Group; or

d.      Seeking advice from a consultant (other than Cangelosi or Aegis Administrative Services) or other expert about the reasonableness of Noble Consulting Group's fees or alternative providers who could provide the services provided by Aegis Administrative Services at a lower cost to the Fund.

117.    From January 1, 2014, through March 31, 2015, Trustee Cozzo retained the services of Noble Consulting Group without:

a.      Engaging in any investigation to determine whether Noble Consulting Group's fee amounts were reasonable;

b.      Engaging in any investigation to determine whether there were other providers who could provide the services provided by Noble Consulting Group at a lower cost;

c.      Issuing a RFP or engaging in any bid process for the services provided by Noble Consulting Group; or

d.      Seeking advice from a consultant (other than Cangelosi or Aegis Administrative Services) or other expert about the reasonableness of Noble Consulting

Group's fees or alternative providers who could provide the services provided by Aegis

Administrative Services at a lower cost to the Fund.

118.     From December 8, 2009, through March 31, 2015, the Fund paid Noble

Consulting Group approximately $5,015 per month in fees for a total of $336,156.

119.     From December 8, 2009, through March 31, 2015, Trustees Fiascone and Adams

approved and paid Noble Consulting Group's monthly charges.

120.     From January 1, 2014, through March 31, 2015, Trustee Cozzo approved and paid

Noble Consulting Group's monthly charges.

121.     By the allegations set forth in paragraphs 106107 through 116 and 118 through

119 above, Trustees Fiascone and Adams:

     a.     failed to act solely in the interest of the participants and beneficiaries of

the Fund and for the exclusive purpose of providing benefits to participants and

beneficiaries and defraying reasonable expenses of plan administration, in violation of

ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

     b.     failed to discharge their duties with the care, skill, prudence, and diligence

under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character

and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B)

     c.     used the Fund's assets in transactions which furnished goods, services, or

facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C),

29 U.S.C. § 1106(a)(1)(C); and

     d.     used the Fund's assets in transactions which Trustees Fiascone and Adams

knew or should have known constituted a direct or indirect transfer to, or use by or for the

28

benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

122.    By the allegations set forth in paragraphs 106 through 115, 117 through 118, and 120 above, Trustee Cozzo:

a.    failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.    failed to discharge her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c.    used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

d.    used the Fund's assets in transactions which Trustee Cozzo knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

123.    As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, and Cozzo as set forth in paragraphs 121 through 122 above, the Fund has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

## COUNT FIVE
### The Fund's Payment of Unreasonable Aggregate Administrative Fees

124.     Paragraphs 1 through 46, 50 through 53, 82 through 83, 107 through 110, and 119 through 120 above are realleged and incorporated in these allegations.

125.     During the Fund year ending in 2013 (April 1, 2012, through March 31, 2013), the overall administrative expenses the Fund paid to all of its service providers, including for Aegis Administrative Services' fees (which included the 10% stop-loss commission it was collecting from Fund assets) and Noble Consulting Group's fees, were equal to 18.6% of the Fund's total costs.

126.     During the Fund year ending in 2014 (April 1, 2013, through March 31, 2014), the overall administrative expenses the Fund paid to all of its service providers, including Aegis Administrative Services' fee ( including the 10% stop-loss commission it was collecting from Fund assets) and Noble Consulting Group's fees, were equal to 20.9% of the Fund's total costs.

127.     From April 1, 2012, through at least March 31, 2014, Trustees Fiascone, Adams, and Cozzo retained the services of Aegis Administrative Services without:

a.     Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts were reasonable;

b.     Engaging in any investigation to determine whether there were other providers who could provide the services provided by Aegis Administrative Services at a lower cost;

c.     Attempting to negotiate with Aegis Administrative Services for lower fees;

d.     Issuing a RFP or engaging in any bid process for the services provided by Aegis Administrative Services; or

e. Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about the reasonableness of Aegis Administrative Services' fees or alternative providers who could provide the services provided by Aegis Administrative Services at a lower cost to the Fund.

128. From April 1, 2012, through at least March 31, 2014, Trustees Fiascone, Adams, and Cozzo retained the services of Noble Consulting Group without:

a. Engaging in any investigation to determine whether Noble Consulting Group's fee amounts were reasonable;

b. Engaging in any investigation to determine whether there were other providers who could provide the services provided by Noble Consulting Group at a lower cost;

c. Attempting to negotiate with Noble Consulting Group for lower fees;

d. Issuing a RFP or engaging in any bid process for the services provided by Noble Consulting Group; or

e. Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about the reasonableness of Noble Consulting Group's fees or alternative providers who could provide the services provided by Noble Consulting Group at a lower cost to the Fund.

129. With respect to Counts Three and Four regarding excessive fees paid to service providers, the Secretary also pleads, in the alternative, that Trustees Fiascone, Adams, and Cozzo approved and paid unreasonable aggregate administrative fees for the Fund.

130. By the allegations set forth in paragraphs 82, 119, and 124 through 128 above from April 1, 2012, through March 31, 2014, Trustees Fiascone and Adams:

      a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

      b.      failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

      c.      used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

      d.      used the Fund's assets in transactions which Trustees Fiascone and Adams knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

131.    By the allegations set forth in paragraphs 83, 120, and 124 through 128 above from January 1, 2014, through March 31, 2014, Trustee Cozzo:

      a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

      b.      failed to discharge her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and

familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

      c.     used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

      d.     used the Fund's assets in transactions which Trustee Cozzo knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

132.    As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, and Cozzo as set forth in paragraphs 130 through 131 above, the Fund has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

<u>**COUNT SIX**</u>
**The Fund's Payment of Unreasonable Administrative Fees to Aegis Administrative Services**

133.    Paragraphs 1 through 46 and 50 through 53 above are realleged and incorporated in these allegations.

134.    From April 1, 2013, through March 31, 2016, Aegis Administrative Services adjudicated out-of-network claims for the Fund; in-network claims were adjudicated by a different service provider.

135.    During the Fund year ending in 2014, Aegis Administrative Services' fees were equal to 55.8% of the Fund's total administrative expenses.

136.    During the Fund year ending in 2014, Aegis Administrative Services' fees were equal to $73.13 on a per contract per month ("PCPM") basis.

137.    During the Fund year ending in 2015, Aegis Administrative Services' fees were equal to 61.1% of the Fund's total administrative expenses.

138.    During the Fund year ending in 2015, Aegis Administrative Services' fees were equal to $62.17 on a PCPM basis.

139.    During the Fund year ending in 2016 (April 1, 2015, through March 31, 2016), Aegis Administrative Services' fees were equal to 63.5% of the Fund's total administrative expenses.

140.    During the Fund year ending in 2016, Aegis Administrative Services' fees were equal to $73.17 on a PCPM basis.

141.    From April 1, 2013, through October 13, 2015, Trustees Fiascone and Adams retained the services of Aegis Administrative Services without:

        a.    Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts were reasonable;

        b.    Engaging in any investigation to determine whether there were other providers who could provide the services provided by Aegis Administrative Services at a lower cost;

        c.    Attempting to negotiate with Aegis Administrative Services for lower fees;

        d.    Issuing a RFP or engaging in any bid process for the services provided by Aegis Administrative Services; or

     e.     Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about the reasonableness of Aegis Administrative Services' fees or alternative providers who could provide the services provided by Aegis Administrative Services at a lower cost to the Fund.

142.    From January 1, 2014, through October 13, 2015, Trustee Cozzo retained the services of Aegis Administrative Services without:

     a.     Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts were reasonable;

     b.     Engaging in any investigation to determine whether there were other providers who could provide the services provided by Aegis Administrative Services at a lower cost;

     c.     Attempting to negotiate with Aegis Administrative Services for lower fees;

     d.     Issuing a RFP or engaging in any bid process for the services provided by Aegis Administrative Services; or

     e.     Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about the reasonableness of Aegis Administrative Services' fees or alternative providers who could provide the services provided by Aegis Administrative Services at a lower cost to the Fund.

143.    From August 25, 2015, through at least October 13, 2015, Trustee Bailey retained the services of Aegis Administrative Services without:

     a.     Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts were reasonable;

b. Engaging in any investigation to determine whether there were other providers who could provide the services provided by Aegis Administrative Services at a lower cost;

c. Attempting to negotiate with Aegis Administrative Services for lower fees;

d. Issuing a RFP or engaging in any bid process for the services provided by Aegis Administrative Services; or

e. Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about the reasonableness of Aegis Administrative Services' fees or alternative providers who could provide the services provided by Aegis Administrative Services at a lower cost to the Fund.

144. Upon information and belief, from October 14, 2015, through at least March 31, 2016, Trustees Fiascone, Adams, Cozzo, and Bailey retained the services of Aegis Administrative Services without:

a. Engaging in any investigation to determine whether Aegis Administrative Services' fee amounts were reasonable;

b. Engaging in any investigation to determine whether there were other providers who could provide the services provided by Aegis Administrative Services at a lower cost;

c. Attempting to negotiate with Aegis Administrative Services for lower fees;

d. Issuing a RFP or engaging in any bid process for the services provided by Aegis Administrative Services; or

e. Seeking advice from a consultant (other than Cangelosi or Noble Consulting Group) or other expert about the reasonableness of Aegis Administrative Services' fees or alternative providers who could provide the services provided by Aegis Administrative Services at a lower cost to the Fund.

145. From April 1, 2013, through March 31, 2016, Trustees Fiascone and Adams approved and paid Aegis Administrative Services' monthly charges.

146. From January 1, 2014, through March 31, 2016, Trustee Cozzo approved and paid Aegis Administrative Services' monthly charges.

147. From August 25, 2015, through March 31, 2016, Trustee Bailey approved and paid Aegis Administrative Services' monthly charges.

148. By the allegations set forth in paragraphs 133 through 141, 144 through 145 above from April 1, 2013, through March 31, 2016, Trustees Fiascone and Adams:

a. failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b. failed to discharge their duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c. used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

d.      used the Fund's assets in transactions which Trustees Fiascone and Adams knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

149.    By the allegations set forth in paragraphs 133 through 140, 142, 144, and 146 above from January 1, 2014, through March 31, 2016, Trustee Cozzo:

a.      failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.      failed to discharge her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c.      used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

d.      used the Fund's assets in transactions which Trustee Cozzo knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

150.    By the allegations set forth in paragraphs 133 through 140, 143 through 144, and 147 above from August 25, 2015, through March 31, 2016, Trustee Bailey:

a.   failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A);

b.   failed to discharge her duties with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, in violation of ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B);

c.   used the Fund's assets in transactions which furnished goods, services, or facilities between the Fund and a party in interest, in violation of ERISA § 406(a)(1)(C), 29 U.S.C. § 1106(a)(1)(C); and

d.   used the Fund's assets in transactions which Trustee Bailey knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

151.   As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, Cozzo and Bailey as set forth in paragraphs 148 through 150 above, the Fund has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

## COUNT SEVEN
### Setting Improper Contribution Rates for Party-In-Interest Employer

152.   Paragraphs 1 through 46 above are realleged and incorporated in these allegations.

153.   From at least January 1, 2010, through November 1, 2015, Q.C. Enterprises, Inc. ("Q.C. Enterprises"), was an Illinois corporation that employed Trustee Adams.

154.    Q.C. Enterprises is a Participating Employer in the Fund.  Therefore, Q.C. Enterprises is a party in interest to the Fund as defined in ERISA section 3(14)(C), 29 U.S.C. § 1002(14)(C).

155.    Trustee Fiascone's wife, Sandra Andritisis, is a party in interest as defined by ERISA Sections 3(14)(E) & (F) because she is the spouse of Trustee Fiascone and she is the sole owner of Q.C. Enterprises.

156.    Since at least January 1, 2010, through November 1, 2015, the Fund charged Q.C. Enterprises less in contribution rates than other participating employers of the Fund for the same benefits.

157.    Although Q.C. Enterprises paid less in contributions than the contributions charged to other participating employers, Q.C. Enterprises still received the same benefits as other participating employers.

158.    Since contribution rates were increased to compensate for the increase in the cost of benefits and Q.C. Enterprises did not have to pay increased contribution rates to receive the same benefits, Fund assets were used for the benefit of Q.C. Enterprises.

159.    Sandra Andritisis, the sole owner of Q.C. Enterprises, paid less in contribution rates to receive the same benefits for Q.C. Enterprises' employees.

160.    Trustee Adams was employed by Q.C. Enterprises from January 1, 2010, through at least November 1, 2015.

161.    Upon information and belief, from January 1, 2010 through at least November 1, 2015, Trustees Fiascone and Adams reviewed all contribution rates and approved contribution rate increases for the Plans.

40

162. Upon information and belief, from January 1, 2014 through at least November 1, 2015, Trustee Cozzo reviewed all contribution rates and approved contribution rate increases for the Plans.

163. Trustees Fiascone and Adams should have known that Q.C. Enterprises and Sandra Andritisis received a benefit when Q.C. Enterprises' contribution rates were not increased.

164. Trustee Fiascone benefited because his wife's business and employees had to pay less into the Fund for health insurance benefits.

165. Trustee Adams benefited from paying less into the Fund for health insurance benefits while he was employed at Q.C. Enterprises and receiving health benefits as far back as January 2010 and through at least November 1, 2015.

166. By the allegations described in paragraphs 152 through 161 and 163 through 165 above, Trustees Fiascone and Adams, from January 1, 2010 and at least November 1, 2015, failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

167. By the allegations described in paragraphs 152 through 160, 162, and 164 through 165 above, between January 1, 2014, and at least November 1, 2015, Trustee Cozzo failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A).

168.    By the allegations in paragraphs 152 through 161 and 163 through 165 above, Trustees Fiascone and Adams:

      a.    used the Fund's assets in transactions which Trustees Fiascone and Adams knew or should have known constituted a direct or indirect transfer to, or use by or for the benefit of, a party in interest, of assets of the Fund, in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D); and

      b.    acted on behalf of a party whose interests are adverse to the interests of the Fund or the interests of their participants and beneficiaries, in violation of ERISA § 406(b)(2), 29 U.S.C. § 1106(b)(2).

169.    From January 1, 2014, through March 31, 2015, Trustee Cozzo is liable, pursuant to ERISA § 405(b)(1), 29 U.S.C. § 1105(b)(1), for the breaches of fiduciary responsibility by a co-fiduciary, as described in paragraphs 152 through 161 and 163 through 165 above, because she failed to use reasonable care to prevent her co-Trustees of the Fund from committing breaches of § 406(a)(1)(D) and (b)(2), 29 U.S.C. § 1106(a)(D) and (b)(2), associated with the Fund.

170.    As a direct and proximate result of the breaches committed by Trustees Fiascone, Adams, and Cozzo as set forth in paragraphs 166 through 169 above, the Fund has suffered injury and losses for which it is entitled to equitable relief, pursuant to ERISA § 409, 29 U.S.C. § 1109.

## COUNT EIGHT
**Failure to Maintain Adequate Fidelity Bond Coverage**

171.    Paragraphs 1 through 46 above are realleged and incorporated in these allegations.

172.     The 2009 Amended Trust Agreement at Article 6.6 requires every person who handles funds or other property or assets of the Fund to be bonded in accordance with the requirements set forth in ERISA § 412.

173.     ERISA § 412 requires the bonding of Plan officials in an amount "not less than 10 per centum of the amount of funds handled…nor more than $500,000…"

174.     The Fund is a trust in which contributions are made to the Fund.

175.     The Fund's sole source of paying benefits is the Fund's trust.

176.     For at least the 2014 Fund year, the total funds handled (total assets at the beginning of the preceding reporting year, receipts during preceding reporting year, minus applicable adjustments) by the Fund was $19,753,780.

177.     For at least the 2014 Fund year, the minimum required bonding coverage was $500,000 pursuant to ERISA § 412(a) and (b).

178.     From September 7, 2013, through at least September 7, 2016, the Fund maintained a fidelity bond issued by the Fidelity and Deposit Company of Maryland for $200,000, with no deductible.

179.     By the allegations described in paragraphs 171 through 178 above, Trustees Fiascone, Adams, Cozzo, and Bailey:

a.       failed to maintain an adequate bond in violation of ERISA § 412(a) and (b), 29 U.S.C. § 1112(a) and (b); and

b.       failed to discharge their duties "in accordance with the documents and instruments" of the Fund to the extent that they are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

## COUNT NINE
**Failure to Properly Appoint Trustees as Required Pursuant to the Plan Document**

180.     Paragraphs 1 through 41 above are realleged and incorporated in these allegations.

181.     On or about the May 25, 2012, Trustee meeting for the Fund, Trustee Adams resigned as an Employee Trustee to become a temporary Employer Trustee.

182.     Trustee Fiascone was the only Employer Trustee between at least March 5, 2009, and the appointment of Adams as a temporary Employer Trustee on May 25, 2012.

183.     Because Trustee Fiascone was the only Employer Trustee between 2009 and the temporary appointment of Adams as an Employer Trustee on Mary 25, 2012, Trustee Fiascone was obligated to nominate an Employer Trustee during this period pursuant to the 2009 amended Trustee Agreement.

184.     The 2009 amended Trustee Agreement also states that Employee Trustees "shall elect among themselves a Chairman" and Employer Trustees "shall elect among themselves a Secretary."

185.     From at least March 5, 2009, to January 22, 2016, no Trustee was appointed as either a Chairman or Secretary pursuant to the requirements of the 2009 amended Trustee Agreement.

186.     On information and belief, from January 23, 2016 to the present, no Trustee was appointed as either a Chairman or Secretary pursuant to the requirements of the 2009 amended Trustee Agreement.

187.     By the allegations described in paragraphs 180 through 183 above, Trustee Fiascone:

          a.       failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and

44

beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

b.    failed to discharge his duties "in accordance with the documents and instruments" of the Fund to the extent that they are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

188.    By the allegations described in paragraphs 180 and 184 through 186 above, Trustees Fiascone, Adams, Cozzo, and Bailey:

a.    failed to act solely in the interest of the participants and beneficiaries of the Fund and for the exclusive purpose of providing benefits to participants and beneficiaries and defraying reasonable expenses of plan administration, in violation of ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A); and

b.    failed to discharge their duties "in accordance with the documents and instruments" of the Fund to the extent that they are consistent with ERISA, in violation of ERISA § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D).

## PRAYER FOR RELIEF

**WHEREFORE**, the Secretary prays that this Court enter a judgment:

A.    Permanently enjoining Defendants Fiascone, Adams, Cozzo, and Bailey from violating the provisions of Title I of ERISA;

B.    Permanently enjoining Defendants Fiascone, Adams, Cozzo, and Bailey from acting as fiduciaries or service providers to any ERISA-covered employee benefit plans;

C.    Ordering Defendants Fiascone, Adams, Cozzo, and Bailey to make good to the Fund all losses, including interest, resulting from fiduciary breaches committed by such Defendant or for which such Defendant is liable;

D.      Requiring each Defendant to disgorge all unjust enrichment or profits received as a result of fiduciary breaches committed by them or for which they are liable;

E.      Ordering Defendants Fiascone, Adams, Cozzo, and Bailey to correct the prohibited transactions in which they engaged, plus appropriate interest;

F.      Appointing an independent fiduciary to terminate the Fund consistent with the Fund's governing documents, the Internal Revenue Code, and ERISA;

G.      Ordering the independent fiduciary to ensure that the Fund maintains adequate fidelity bond coverage consistent with ERISA;

H.      Ordering Defendants Fiascone, Adams, Cozzo, and Bailey to pay all reasonable fees and expenses incurred by the independent fiduciary in terminating the Fund;

I.      Awarding the Secretary the costs of this action; and

J.     Ordering such further relief as is appropriate and just.


Dated: _____June 6, 2017___             **NICHOLAS C. GEALE**
                                           Acting Solicitor of Labor

                                           **CHRISTINE Z. HERI**
                                           Regional Solicitor

                                           s/Mark Henry Ishu_____
                                           **MARK HENRY ISHU**
                                           Trial Attorney

                                           s/Kevin M. Wilemon_____
                                           **KEVIN M. WILEMON**
                                           Trial Attorney

P.O. Address:                              Attorneys for **R. ALEXANDER**
Office of the Solicitor                    **ACOSTA**, Secretary of Labor,
U.S. Department of Labor                   Department of Labor, Plaintiff
United States
230 South Dearborn Street
Eighth Floor
Chicago, Illinois 60604
Telephone:  (312) 353-6973
Fax: (312) 353-5698
ishu.mark.h@dol.gov
wilemon.kevin@dol.gov